IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
(JACKSONVILLE DIVISION)

EMILY CARGILL

&

ALISON FRANCISCUS

Plaintiffs,

v.

Case No.

MICHAEL BRICKER
CHIEF OF THE CITY OF JACKSONVILLE's
DIVISION OF ANIMAL CARE AND PROTECTIVE SERVICES
in his official capacity,

&

THE CITY OF JACKSONVILLE, FLORIDA
a political subdivision created
pursuant to the Florida Constitution
and laws of the State of Florida,

Defendants.

______________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Emily Cargill and Alison Franciscus sue Defendants, Michael Bricker and the City of Jacksonville and allege:

## NATURE OF THE ACTION

1. This is a First Amendment action pursuant to 42 U.S.C. § 1983 challenging the suppression of Plaintiffs' protected speech regarding matters of public concern. This action also seeks specific performance and enforcement of the Florida public records law, Chapter 119 Florida Statutes.

## JURISDICTION AND VENUE

2. Court has jurisdiction over the federal claims his matter pursuant to 28 U.S.C. § 1331 and 1343 (3) and (4) and jurisdiction of the state claims under 28 U.S.C. § 1367.
3. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as the cause of action arose in Duval County and a substantial part of the events occurred in Duval County.
4. All conditions precedent to bringing this action have occurred, have been performed, or have been waived.

## PARTIES

5. Plaintiff Emily Cargill (hereinafter "Cargill") is an adult resident of Jacksonville, Florida.

6. Plaintiff Alison Franciscus (hereinafter "Franciscus") is an adult resident of Keystone Heights, Florida.

7. Defendant City of Jacksonville (hereinafter "City") is a political subdivision of the State of Florida incorporated under the Laws of Florida.

8. The City is an "agency" as defined by §119.011(2) Fla. Stat. and is subject to Article I, Section 24 of the Florida Constitution and Chapter 119, Florida Statutes.

9. Defendant Michael Bricker (hereinafter "Bricker") is the Chief of the City's Division of Animal Care and Protective Services (hereinafter "ACPS") and is responsible for overseeing and managing the City's municipal Animal Shelter.

10. Bricker was at all times material hereto acting under color of the law as the Chief of ACPS.

## BACKGROUND

11. ACPS operates Jacksonville's Animal Care and Protective Services Center ("Animal Shelter") at 2020 Forest Street, Jacksonville, FL 32204.

12. The Animal Shelter is publicly funded by the City with taxpayer dollars.

13. The management of and conditions at the Animal Shelter are and have been a subject of public concern and public debate in the Jacksonville area and beyond.

14. At all times material hereto, Bricker had managerial responsibility and decision-making authority and final policy making authority for the Animal Shelter and ACPS social media content.

**PLAINTIFF EMILY CARGILL**

15. Cargill is an animal welfare advocate who volunteered for ACPS as a foster care provider beginning in December of 2025.

16. As a foster care provider Cargill temporarily cared for dogs in her home while the dogs were awaiting adoption.

17. Providing a foster home for a homeless animal frees up space in the Animal Shelter and allows the animal to enjoy living in a home rather than in a cage while awaiting permanent placement.

***Cargill's posts were deleted from the ACPS Foster Communication Page***

18. Facebook is a social media networking website accessible to users through the internet, and which allows users of the website to post comments, share photographs, link to other websites, and engage in general discourse.
19. ACPS administers various Facebook, including the "ACPS Foster Communication Page" which is described as "intended for ACPS-approved fosters to help communicate with the Foster Office."
20. Bricker is one of the administrators of the ACPS Foster Communication Page.
21. At the time of this filing the ACPS Foster Communication Page had 2730 members.
22. The content of the posts on the ACPS Foster Communication Page concerns official ACPS business.
23. Bricker also routinely deletes comments from ACPS pages he administers if he perceives the comments to be negative about ACPS or if he otherwise does not like their content.
24. Cargill was a member of the ACPS Foster Communication Page.

25. Cargill and her family began fostering a dog named Lousie ("Lou") fka "Gerti" on May 26, 2026.

26. When Cargill received Lou from a previous foster home, she was not given any information regarding procedures to follow to transfer an animal to a new foster home if she could no longer foster an animal in her care, or what steps to take in case of medical emergency with a fostered animal, save a one-page document with a phone number for the foster office and another number for after hour emergencies.

27. Cargill fostered Lou for a few weeks but then needed to make alternative arrangements for Lou as Cargill was preparing to move out of state.

28. Cargill made posts on social media with pictures of Lou asking for a new foster to step up so Lou would not have to return to the Animal Shelter:

29.

**Emily Cargill** is with **Katie Fort** and **4 others.**

Jun 25 ·

🫶🫶FOSTER TAKE OVER NEEDED FOR GERTI (now Louise) 🫶🫶 This sweet older gal needs a foster takeover or new forever family by July 31. She is an easy-going, couch potato who loves treats of all kinds and just being near her people. Great with kiddos and other dogs- currently in a home with both. Also cat friendly!!! 😻 We are moving to VA and DO NOT want her to go back to the shelter. This girl is too sweet for that.

Please reach out if you could consider her



30. Another ACPS volunteer located a new foster care provider, Jack Laverty, and arranged for Mr. Laverty to take over Lou's care.

31. On June 30, 2026, Lou was transported to Mr. Laverty's home.

32. Because Mr. Laverty does not drive, yet another ACPS volunteer, Renee Richmond, delivered a vial containing prescription heartworm/flea preventative medication for Lou to Mr. Laverty.

33. Mr. Laverty was not given any written instructions for administering the medication he was provided, and was told by Ms. Richmond the medication could be given with food.

34. On July 14, 2026, Lou became very ill after ingesting the medication that Mr. Laverty had been given because the medication was only for topical use.

35. Mr. Laverty immediately called and texted Cargill when Lou started showing signs of being ill.

36. Cargill attempted to call the number she had been provided for after hour emergencies, but the listed number was a wrong number.

37. After a flurry of phone calls and texts among Cargill and ACPS and other volunteers Cargill was eventually told by ACPS that Lou

should be taken Blue Pearl Animal Hospital, an emergency facility open 24/7.

38. A friend of Mr. Laverty was driving Lou to Blue Pearl Animal Hospital for much needed emergency care when Cargill received a call informing her that Lou should be taken to ACPS.

39. Cargill redirected the car with Lou to ACPS.

40. Cargill's husband rushed to ACPS to assist with Lou.

41. Lou was not treated at ACPS, instead when the dog arrived Cargill's husband was directed to take Lou to Pet Urgent Response and Emergency ("PURE"), a different emergency facility for animals.

42. Upon arrival at PURE Cargill's husband had to sit helplessly with Lou while the dog was having seizures for approximately 20 minutes, waiting for Bricker to approve starting treatment.

43. Two and a half hours after ACPS was alerted to Lou's emergency condition Bricker finally approved beginning treatment at PURE.

44. The following day, Cargill's husband was told by Lou's treating veterinarian that ACPS approval was needed to continue Lou's treatment at PURE.

45. Bricker denied permission for continuing Lou's care and directed her to be picked up by an ACPS employee and returned to the Animal Shelter.

46. An ACPS employee picked Lou up, and Lou died within minutes of being taken out of PURE's care.

47. Cargill posted about the circumstances leading up to Lou's death on the ACPS Foster Communication Page, adding that she would like to have a meeting with all of the ACPS fosters and foster staff to talk about what happened with Lou.

48. Bricker deleted her posts from the ACPS Foster Communication Page and blocked her from being able to access the page.

49. Cargill was not given any explanation for why her comments were deleted or why she was blocked.

***Bricker's Personal Facebook Page***

50. Bricker's has a personal Facebook page which does not identify him as the Chief of ACPS or as affiliated with ACPS.




51. Bricker has authority to speak on behalf of ACPS.

52. Bricker uses his personal Facebook page to comment upon official ACPS business.

53. Bricker also administers the ACPS Foster Communication Page as “Mike Bricker.”

54. On example of Bricker using his Facebook page to speak on behalf of ACPS occurred soon after Lou’s death when an ACPS volunteer named Pablo Anzueto posted on his own personal Facebook page expressing hope that ACPS protocols for foster animals with medical emergencies would be improved in the wake of Lou’s death.

55. Bricker made several comments in response to Pablo Anzueto’s post regarding Lou’s death from his personal Facebook page as “Mike Bricker.”

56. Bricker's comments attempted to shift blame for Lou's death from ACPS to Cargill by creating a false narrative that Cargill had transferred Lou to an "unapproved" caregiver.

57. Bricker's comments regarding Lou's death were made in furtherance of his duties as chief of ACPS, in defense of ACPS:

58. 

59. 


60. Cargill responded directly to Bricker's comments that Bricker had made on Pablo Anzueto's Facebook page clarifying that she did not arrange for Lou's transfer to Mr. Laverty.

61. Bricker then blocked Cargill from his personal Facebook page, meaning she could no longer see or comment upon his posts about ACPS business.

62. Bricker has also blocked many other individuals who have publicly criticized his policies and leadership from being able to see or comment on any Facebook posts made about ACPS official business as "Mike Bricker."

63. Cargill is interested in conditions at the Animal Shelter and the treatment of animals that are in the care of ACPS.

64. Conditions at the Animal Shelter and the treatment of animals that are in the care of ACPS are matters of public concern.

**PLAINTIFF ALISON FRANCISCUS**

65. Franciscus is an animal welfare advocate who volunteers her time to save the lives of homeless dogs and cats.

66. Franciscus volunteered at the City's municipal animal shelter from September to November of 2023.

67. While volunteering at the City's animal shelter, Franciscus observed inhumane conditions including overcrowding and lack of sanitation and animals caged in freezing temperatures.

68. Because Franciscus spoke out about the inhumane and unsanitary conditions at the animal shelter, she was banned from continuing to serve as a volunteer.

69. Franciscus has also been blocked from seeing or commenting on posts by "Mike Bricker" regarding official ACPS business, such as the posts he made regarding Lou on Pablo Anzueto's Facebook page.

70. Franciscus is interested in conditions at the Animal Shelter and the treatment of animals that are in the care of ACPS.

71. Conditions at the Animal Shelter and the treatment of animals that are in the care of ACPS are matters of public concern.

## BRICKER's CENSORSHIP OF PLAINTIFFS' SPEECH IN A PUBLIC FORUM IS STATE ACTION

72. When a person with governmental authority uses his personal Facebook page for posting about public business, the official's posts and the space for commenting are at least a limited public forum in which viewpoint discrimination is prohibited.

73. Bricker's use of his Facebook page and censorship of Cargill and Franciscus and others constitute state action because:

    a. He possesses actual authority to speak on behalf of the City regarding ACPS policies and operations; and

    b. He exercises that authority when using the page to comment about ACPS official business.

74. Bricker's Facebook page functions as an instrument of public communication.

75. Cargill posted on the ACPS Foster Communication Page about the events leading up to Lou's death.

76. Bricker deleted her comments and blocked her entirely from even viewing the ACPS Foster Communication Page.

77. Soon after blocking Cargill's access to the ACPS Foster Communication Page he also blocked her from his personal Facebook page which he routinely uses to discuss ACPS official business.

78. Bricker's act of blocking Cargill was undertaken while he was exercising his authority as Chief of ACPS in maintaining an online forum for communications regarding matters of public concern. His moderation decisions were thus made under color of state law.

79. Bricker has also blocked Franciscus from seeing or commenting on his posts regarding ACPS official business.

80. Bricker's decisions to delete Cargill's posts from a Facebook page he administers and to block Cargill and Franciscus from viewing and commenting on his posts were motivated by disagreement with their viewpoints.

81. As a result of Bricker blocking, excluding, or otherwise limiting Plaintiffs from full access to his Facebook page and ACPS Facebook Pages, Bricker has improperly limited, and continues to limit, Plaintiffs' ability to utilize Facebook to engage in discussions concerning matters related to animal welfare in Jacksonville.

82. Bricker's exclusion of Plaintiffs from a public forum based on their viewpoints constitutes impermissible viewpoint discrimination in violation of the First Amendment.

***83.*** Bricker's viewpoint discrimination deprives Plaintiffs of their right to participate in public discourse, to petition their government for redress, and to access information disseminated by a public official.

**PRIOR LAWSUIT AND SETTLEMENT AGREEMENT VIOLATIONS**

84. On February 26, 2024, Franciscus filed a lawsuit in federal court, styled *Alison Franciscus v. City of Jacksonville, Florida*, Case No. 3:24-cv-212-HES- PDB, seeking redress for being banned from volunteering based upon having exercised her First Amendment rights.

85. On May 15, 2025, the parties participated in a settlement conference with Magistrate Judge Laura Lothman Lambert and negotiated a settlement agreement that was executed the same day. The settlement agreement is attached hereto and incorporated by reference as Exhibit One.

86. Bricker, as Chief of ACPS, participated in the mediation on behalf of the City.

87. Pursuant to the settlement agreement, Franciscus agreed to dismiss her lawsuit in exchange for payment of $75,000.00 and the City's promise to implement policy changes that include the following:

   a. Amending the City's Volunteer Handbook to delete blatantly unconstitutional provisions purporting to restrict volunteers from speaking about conditions at the Animal Shelter or sharing pictures taken at the animal shelter without management's approval;

   b. The City making information regarding animals destroyed at the City's Animal Shelter publicly available on its website monthly as

well as information regarding whether an animal's destruction was based upon medical or behavioral issues or lack of space;

c. The City advertising on its website that rescue organizations could request to receive information regarding animals risk of euthanasia;

d. The City sending weekly emails to rescue organizations regarding specific animals in need of urgent placement because the animal is at risk of euthanasia.

88. The settlement agreement required that the policy changes be implemented within 30 days of its execution on May 15, 2025, i.e., by June 14, 2025.

89. On July 28, 2025, Plaintiffs' counsel made an online public records request through the City's public records portal for:

> *All emails sent by any employee of Jacksonville Animal Care and Protective Services to any rescue organization regarding animals in need of urgent placement or at risk of euthanasia.*

90. After much back and forth with the Public Records Coordinator, and after paying $54.69, $45.00 for "System Time" and $ 9.69 for clerical

time, only three emails were provided, one dated June 16, 2025, one dated June 17, 2025 and one dated July 29, 2025.

91. None of the three emails say anything about the animals suffering from fear, anxiety or stress or that they are at risk of destruction.

92. The emails contained pictures of animals under the heading “in need of rescue,” something which could accurately be said of every animal in the shelter.

93. Multiple dogs were euthanized after June 15, 2025 the effective date of the settlement agreement, without any advance notice to rescue organizations. By way of example, one July 24, 2025 email exchanged among members of the “leadership team” reveals 8 dogs were approved for destruction: Vincent, Athens, Haines, Ori, Moe, Lord Farquaad, Oatmeal Cream Pie and Martin. See Exhibit Two.

94. The ACPS notes regarding Moe indicate the dog was “fearful, avoidant and shut down in kennel.”

95. Moe is precisely the type of dog that the policy changes negotiated in mediation were supposed to help.

96. No emails were sent regarding Moe or any of the other dogs slated for destruction.

97. More than three months after the settlement agreement was executed, Franciscus's undersigned counsel reached out to Mary Margaret Giannini and Christopher Garrett, the City's attorneys *Alison Franciscus v. City of Jacksonville, Florida*, Case No. 3:24-cv-212-HES-PDB, regarding the City's failure to comply with the settlement agreement. A copy of the August 25, 2025 correspondence sent to counsel for the City is attached hereto and incorporated by reference as Exhibit Three.

98. On August 27, 2025 Counsel for the City indicated that an initial conversation with Mr. Bricker had occurred, another meeting with Mr. Bricker was scheduled for the following day, after which the City's attorneys "will then be far better informed to substantively respond to your concerns and will do so in a timely manner."

99. On August 29, 2025, Mary Margaret Giannini formally responded to Plaintiff's concerns regarding the breaches of settlement identified by Plaintiff's counsel, painting a rosy albeit wholly fictional account of

the actions of ACPS taken to comply with the settlement agreement. The City's August 29, 2025 correspondence is attached hereto and incorporated by reference as Exhibit Four.

100. According to the City's August 29, 2025 correspondence:

> *In compliance with the Settlement Agreement, ACPS added a link on its website for "Pet Placement Partners." Rescue organizations who register through that page – as well as rescue organizations that are already registered with ACPS – receive weekly emails from ACPS regarding animals identified as suffering from fear, anxiety, and stress (FAS), and are in need for urgent placement or are at possible risk of euthanasia. Based on those weekly emails, rescue organizations can then seek to adopt or foster at-risk animals.*

101. Contrary to the representation of the City's counsel, the link for "Pet Placement Partners" was not added to the ACPS website pursuant to the settlement agreement, it had been on the website before the lawsuit had been filed.

102. Franciscus's counsel asked for copies of the weekly emails referenced in the August 29, 2025 correspondence that had supposedly gone to "placement partners" as no such emails had been provided in response to her prior public records request.

103. The requested emails were not provided.

104. On September 2, 2025, another letter was sent regarding the ongoing breaches of the settlement agreement via email. See composite Exhibit Five.

105. More than two weeks later, on September 18, 2025, Mary Margaret Giannini sent another letter again assuring that ACPS "is currently fully complying with the agreement's terms." The City's September 18, 2025 correspondence is attached hereto and incorporated by reference as Exhibit Six.

106. As of the date of this filing, more than a year after the settlement agreement was executed, the policy changes required by the settlement agreement have not been implemented.

**The City's Violations of the Public Records Law**

107. On May 7, 2026 undersigned counsel made an online public records request through the City's public records portal seeking:

> *a copy of all emails sent to rescue organizations regarding animals in need of urgent placement or at risk of euthanasia because of medical or behavioral issues pursuant to the settlement agreement between Alison Francicus and the City of Jacksonville executed May 15, 2025 resolving case no 3:24-cv-212-HES-PBD which was filed in the Federal Court for the Middle District of Florida.*

108. In response to the public records request above, on May 8, 2026, Plaintiff's counsel received a response stating:

> *This letter is to clarify what records you are seeking from the City of Jacksonville.*
>
> *A system resource charge of $45.00 per hour applies to every email search conducted. The initial search incurs this fee, plus additional costs for reviewing and redacting results. This charge applies even if the search does not yield any results. Please review the search criteria below and confirm your approval before proceeding.*
>
> *Date Range: May 15, 2025 to Present*
> *Email Account: Animal Care & Protective Services Staff, Chief Michael Bricker, MBricker@coj.net*
> *Search Term(s): Rescue Organizations*
> *And*
> *Urgent, placement, at risk, euthanasia, medical, behavioral*

109. On May 25, 2026 Plaintiff's counsel forwarded the response to Mary Margaret Giannini, counsel for the City, and requested her assistance in locating any emails that had been sent pursuant to the settlement agreement, stating:

> *Mary Margaret- I sent the public records request below on May 7, 2026, and received a response asking me to approve search terms. I do not think it is my job to conjure up the search terms, if any, that will locate the*

> *emails that were supposed to have been sent pursuant to the settlement agreement. I have no way of knowing what email address the responsive emails were sent from or what buzz words would appear in those communications. As I doubt you wish for me to contact Mr. Bricker myself, I respectfully request your prompt assistance in this matter. Thank you.*

110. As of this filing, Plaintiffs' counsel has not enjoyed the courtesy of a response to her May 25, 2026 email to Mary Margaret Giannini.

111. On June 7, 2026 a statutory pre-suit notice was sent to the City's public records coordinator with a courtesy copy to Mary Margaret Giannini warning that if the records responsive to her request were not provided within 5 days a public records suit would be filed. The pre-suit notice is attached hereto and incorporated by reference as Exhibit Seven.

112. On June 11, 2026 the following communication was received from the Public Records Center:

> *Good evening. I want this to be as cost effective as possible. The search terms I provided is to narrow the emails down to only the items you're seeking. Would you like to change the criteria than what is listed below?*

> *Date Range: December 1, 2025 to June 1, 2026*
>
> *Email Account: ACPS Staff, Chief of ACPS Michael Bricker, MBricker@coj.net, ACPSFosters@coj.net,*
>
> *Search Term(s): rescue organizations*
>
> *AND*
>
> *urgent placement, euthanasia, medical, behavioral, placement partner*

113. Plaintiffs' counsel replied that the City should reach out to the employee with knowledge of the records rather than require Plaintiffs' counsel to guess the search terms that might identify the requested records.

114. On June 15, 2026 the "Public Records Center" responded:

> *All email searches go through the Technology Solutions division and before I can send the search to them, I must have your approval of the cost. Please confirm if you agree to the search term and the charge.*
>
> *Date Range: December 1, 2025 to June 1, 2026*
>
> *Email Account: ACPS Staff, Chief of ACPS Michael Bricker, MBricker@coj.net, ACPSFosters@coj.net,*
>
> *Search Term(s): rescue organizations*
>
> *AND*

> *urgent placement, euthanasia, medical, behavioral, placement partner*

115. On June 16, 2026, Plaintiff's counsel capitulated and "approved" the search terms and paid the demanded "system resource charge" of $45.00.

116. Later that day several wholly unrelated documents were provided in response to the public records request for emails sent pursuant to the settlement agreement.

117. Notably no emails regarding animals at risk of destruction were provided.

118. Franciscus made her own separate public records request on May 6, 2026, seeking:

> Any and all emails from 5/15/2025 through the present from Animal Care & Protective Services (ACPS) from any/all personnel including but not limited to: Michael Bricker, foster/rescue coordinator, Destiny Stiles, Franny Buffa, or any/all ACPS staff, to any and all animal rescue organizations.

119. Franciscus was also asked to approve search terms and required to pay a $45.00 "system resource charge."

120. Again, exactly zero emails regarding animals at risk of destruction were provided.

121. The City continues to violate the settlement agreement and the public records law.

122. Franciscus has retained counsel to enforce the settlement agreement and her right to public records and is obligated to pay for her services.

**COUNT I – 42 U.S.C. § 1983, First and Fourteenth Amendment Violation as to Emily Cargill**

123. Cargill repeats and re-alleges paragraphs 1 to 60, and 68-79 as if fully set forth herein.

124. Bricker uses his personal Facebook page to comment on official ACPS business.

125. Bricker has a policy and practice of blocking individuals that have opinions that he disagrees with so that the individuals are unable to see Bricker's posts on social media concerning regarding operation of the Animal Shelter.

126. Bricker has a policy and practice of deleting posts from ACPS Facebook pages if the posts are critical of him, or of ACPS, or if he otherwise disagrees with their content.

127. By deleting Facebook posts with which he disagrees, he is engaging in viewpoint discrimination.

128. Bricker's viewpoint-based blocking of citizens including Cargill prevents her from viewing his posts regarding ACPS official business, commenting on those posts, viewing the comments of other Facebook users on those posts, and from participating in the comment threads regarding matters of public concern raised therein.

129. Bricker's acts in posting about ACPS matters as "Mike Bricker" are taken under color of state law, custom or usage.

130. Bricker's acts in blocking citizens including Franciscus from seeing or commenting on his posts about ACPS matters were taken under color of state law, custom or usage.

131. Bricker's acts described herein were purposeful and arise from an official policy or custom.

**COUNT I-42 USC § 1983, First and Fourteenth Amendment Violation as to Alison Franciscus**

132. Franciscus repeats and re-alleges paragraphs 1 to 14, 18, 21-24, 58 and 61-70 as if fully set forth herein.

133. Bricker's viewpoint-based blocking of access to Facebook posts regarding official ACPS business imposes an unconstitutional restriction on Franciscus's participation in a public forum.

134. Bricker's viewpoint-based blocking imposes an unconstitutional restriction on Franciscus's access to information regarding ACPS official business.

135. Bricker's viewpoint-based blocking imposes an unconstitutional restriction on Franciscus's right and ability to petition the government for redress of grievances.

136. Preventing Franciscus from viewing or commenting on social media posts regarding official ACPS business violates Franciscus's constitutional right to freedom of speech and her right to petition her government.

## COUNT III- SPECIFIC PERFORMANCE/ENFORCEMENT OF THE SETTLEMENT AGREEMENT

137. Franciscus repeats and re-alleges paragraphs 1-14 and 80-120 as if fully set forth herein.

138. On May 15, 2025, the Franciscus and the City participated in a mediation and reached a settlement of Franciscus's prior lawsuit against the City for violation of Franciscus's constitutional rights to free speech.

139. The City is in breach of that settlement agreement. The City is does not send and has not sent weekly emails informing rescue organizations of animals at risk of or scheduled for destruction as required by the settlement agreement.

140. Franciscus fulfilled her obligation under the settlement agreement, which was to dismiss her federal lawsuit.

141. The City has failed to comply with its obligation under the settlement agreement to implement specified policy changes.

142. Money damages are inadequate to remedy the harm to Franciscus caused by the City's ongoing breach of the settlement agreement because Franciscus bargained for specific policy changes

to increase transparency and publicize animals slated for or being considered for destruction, not merely monetary compensation.

143. The settlement agreement provides that "The Parties will not be entitled to recover any costs or attorneys' fees relating to the Litigation in addition to the amount paid under this Agreement, <u>except in the event of any actions to enforce the terms of this agreement</u>." (emphasis added).

144. This is an action to enforce the terms of the settlement agreement.

**COUNT IV-DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF THE PUBLIC RECORDS LAW**

145. Franciscus repeats and re-alleges paragraphs 1-14, 85-86 and 103-118 as if fully set forth herein.

146. It is the policy of this state that all state, county, and municipal records are open for personal inspection and copying by any person. Providing access to public records is the duty of each agency. § 119.01(1), Fla. Stat. *See also Morris Publ'g Grp., LLC v. State*, 154 So. 3d 528, 530 (Fla. 1st DCA 2015).

147. The Public Records Act requires a records custodian to determine whether the requested records exist, locate the records, and review each record to determine if it is exempt from production. *City of St. Petersburg v. Dorchester Holdings, LLC*, 331 So. 3d 799, 805 (Fla. 2d DCA 2021).

148. An agency may not avoid this duty by shifting to the requester the burden of guessing the correct internal "search terms" or agency employees most likely to locate records that have been requested.

149. Nor may an agency impose a special service charge unless the nature or volume of the request requires extensive use of information technology resources or clerical or supervisory assistance, and the charge is reasonable and based on the cost actually incurred.

150. On May 7, 2026 counsel for Franciscus made a very specific public records request for

> *a copy of all emails sent to rescue organizations regarding animals in need of urgent placement or at risk of euthanasia because of medical or behavioral issues pursuant to the settlement agreement between Alison Francicus and the City of Jacksonville executed May 15, 2025 resolving case no 3:24-cv-212-HES-PBD which was filed in the Federal Court for the Middle District of Florida.*

151. Rather than make a good faith inquiry to ACPS, the relevant City division that would have knowledge regarding the existence and location of the requested public records, the City insisted that Franciscus's counsel approve search terms so that a search could be done by the City's Technology Solutions Department.

152. The duty rests with public records coordinator to locate requested public records; the requestor is not obligated to speculate as to the "search terms" that might produce the public records he or she seeks.

153. The City has a policy of requiring any person who makes a public records request that includes emails, even a single email, to pay a minimum of $45.00 for a search by the Technology Solutions Department.

154. That charge does not offset an actual cost incurred by the City.

155. The City has a statutory duty to "establish and maintain an active and continuing program for the economical and efficient management of records." §257.36(5)(b) Fla. Stat.

156. Automation of public records must not erode the right of access to those records. § 119.01(2). Fla. Stat.

157. Pursuant to § 119.07(4)(d), Florida Statutes "[t]he custodian of public records shall furnish a copy or a certified copy of the record upon payment of the fee prescribed by law." (emphasis added)

158. Section 119.07(4)(d), Florida Statutes further provides:

> If the nature or volume of public records requested to be inspected or copied pursuant to this subsection is such as to require extensive use of information technology resources or extensive clerical or supervisory assistance by personnel of the agency involved, or both, the agency may charge, in addition to the actual cost of duplication, a special service charge, which shall be reasonable and shall be based on the cost incurred for such extensive use of information technology resources or the labor cost of the personnel providing the service that is actually incurred by the agency or attributable to the agency for the clerical and supervisory assistance required, or both. (emphasis added)

159. Neither the nature nor the volume of public records requested by Franciscus or her counsel required extensive use of information technology resources. The City chose to enlist its Technology

Solutions Department to search for responsive records rather than requesting them from ACPS.

160. The City does not demand a $45.00 fee only for requests that involve the extensive use of technology resources, the City imposes a blanket $45.00 "system resource charge" for every email search conducted.

161. The "system resource charge" imposed by the City is not statutorily authorized or otherwise "prescribed by law" when imposed as a blanket charge without a request-specific determination that the nature or volume of records requires extensive use of information technology resources or extensive clerical or supervisory assistance.

162. By conditioning the constitutionally guaranteed right to examine public records upon payment of an unauthorized charge, the City has violated and continues to violate the public records law.

163. Shifting the burden of locating public records to members of the public by insisting individuals that make a request clairvoyantly

predict the "search terms" that will identify the requested records violates the public records law.

164. An actual, present, and justiciable controversy exists between the parties concerning whether the City may condition access to requested public records on payment of a blanket "system resource charge" and approval of City-selected search terms. Franciscus has a bona fide, actual, present, and practical need for a declaration of her rights under Article I, Section 24 of the Florida Constitution and Chapter 119, Florida Statutes. The parties have adverse interests, the declaration sought turns on presently ascertainable facts and applicable law, and the relief sought is not an advisory opinion.

165. Franciscus desires a judicial declaration of her right to access public records pursuant to Chapter 119, Fla. Stat. without imposition of an illegal "system resource charge."

166. Franciscus has retained the undersigned counsel in this matter to enforce her constitutional and statutory rights to access public records.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiffs request that this Court enter judgment in their favor on each of their respective claims against the Defendants as follows:

a. Declaring that Bricker's deletion of Cargill's comments and blocking her from the ACPS Foster communication page was viewpoint discrimination and violated her First Amendment Rights under color of law;
b. Declaring that Bricker's blocking Franciscus and Cargill and other individuals from viewing and commenting upon Bricker's posts regarding ACPS official business was viewpoint discrimination and violated their First Amendment Rights under color of law;
c. Enjoining Michael Bricker from deleting Facebook posts on ACPS administered Facebook pages based on their content and from blocking Plaintiffs or other individuals from viewing or commenting on his posts regarding ACPS business;
d. Specifically enforcing paragraph 4 of the settlement agreement between Franciscus and the City by ordering the City to implement all required policy changes by a date certain and requiring the City to certify compliance;

e. Declaring that the City may not impose a blanket "system resource charge" to fulfill a public records request that does not require an extensive use of information technology resources within the meaning of section 119.07(4)(d), Florida Statutes;
f. Finding that by imposing a uniform "system resource charge" on all email searches the City unlawfully refused to permit access to public records in violation of the Act and Article I, Section 24 of the Florida Constitution;
g. Enjoining the City from imposing a blanket minimum "system resource charge" for email searches absent a request-specific determination that section 119.07(4)(d), Florida Statutes, authorizes such a charge;
h. Awarding Plaintiffs their reasonable attorneys' fees and costs incurred in this action pursuant to 42 USC § 1988, § 119.12 Fla. Stat., the settlement agreement, and any other applicable law;
i. Awarding Plaintiffs such other and further relief as the Court deems necessary and appropriate;
j. Retaining jurisdiction to ensure compliance with the settlement agreement.

Respectfully submitted this 3rd day of August, 2026.

MARCY I. LAHART, PLLC

s/ Marcy I LaHart

Marcy I. LaHart, Lead Counsel for Plaintiffs
Fla. Bar No. 0967009
WA Bar No. 62077
861 S. 40th Street
Tacoma, WA 98418
877-364-5290
Fax: (888) 400-1464
marcy@animallawattorney.com